# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

_____

**In Re**

DENNIS C. STITT, JR.,

              **Debtor.**

**Bankruptcy Case
No. 08-40386-JDP**

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

Paula Brown Sinclair, Twin Falls, Idaho, Attorney for Debtor.

Kathleen A. McCallister, Kuna, Idaho, Chapter 13 Trustee.

### *Introduction*

In this case, the Court must decide whether a debtor's chapter 13[1]

plan should be confirmed.  After careful consideration of the record, the

parties' arguments, and the applicable law, the Court concludes that

_____

    [1] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal
Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM OF DECISION - 1

confirmation must be denied.[2]

### *Procedural Background*

Debtor Dennis Stitt, Jr. ("Debtor") filed a petition for relief under

chapter 13 of the Bankruptcy Code on May 14, 2008.  Docket No. 1.

Debtor's original plan, filed on the same day as his petition, proposed to

make 60 monthly payments of $120 to the chapter 13 trustee for

distribution to his creditors.  Docket No. 7.  The chapter 13 trustee,

Kathleen McCallister ("Trustee") objected to Debtor's original plan.  She

identified several of what she considered to be errors in Debtor's Official

Form 22C, requested various documents to support the numbers listed in

the Form, and opined that several of Debtor's listed expense items

exceeded those in the IRS allowances.[3]  Docket No. 25.

On July 16, 2008, Debtor amended his plan.  Docket No 27.  The

---

[2] This Memorandum constitutes the Court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 9014, 7052.

[3] Wells Fargo, a secured creditor, also filed a written objection to Debtor's original plan.  *See* Docket No. 23.  This objection was not renewed after subsequent amendments to the plan.

MEMORANDUM OF DECISION - 2

amended plan proposed to make fewer payments to Trustee (*i.e.,* now 30

monthly payments), but to increase the amount of each payment to $161.

In addition, the amended plan proposed to sell two of Debtor's horses and

contribute all sale proceeds to fund the plan.  Trustee renewed her

objection on the grounds that the amended plan did not pay unsecured

creditors at least the liquidation value of Debtor's assets as required under

§ 1325(a)(4), and that the plan was not proposed in good faith as required

by § 1325(a)(3).  Docket No. 29.  In addition, Trustee noted that Debtor had

failed to correct the errors in Official Form 22C, and had not addressed

excessive expenses for transportation and housing.  *Id*.  Following a

hearing, the Court denied confirmation on Debtor's amended plan, but

granted leave to Debtor to propose another amended plan.  Docket No. 30.

Debtor filed his second amended plan on August 9, 2008, in which

he proposed to make 60 monthly payments to Trustee.  Docket No. 31.

This plan contemplates initial monthly payments to Trustee of $120, with

MEMORANDUM OF DECISION - 3

two step-ups in amount at later stages of the plan.[4]  In addition, this plan

proposes an annual payment of $1,500 in each of the first two years of the

plan.  Trustee objected to confirmation of this plan as well.  Her objection

explains that there are still errors in Debtor's Official Form 22C and Debtor

has not addressed the high expenses claimed for housing and

transportation.  Docket No. 35.  In addition, Trustee alleged that this plan

was likewise not filed in good faith.  *Id*.  In response to Trustee's objection,

Debtor amended schedules I and J, and Official Form 22C.  Docket Nos. 37,

38.

On September 2, 2008, the Court conducted a confirmation hearing

on Debtor's second amended plan.  Documentary exhibits were admitted

into evidence, and Debtor testified in response to questions from his

counsel, Trustee, and the Court.  At the close of the evidence, the parties

requested to submit their closing arguments via briefs.  This request was

─────────────────────

[4] Prior to filing bankruptcy, Debtor received two separate loans from his
Thrift Savings Plans.  Payments for these loans are currently being automatically
deducted from his paychecks.  Both of these loans will be paid off during the
term of Debtor's proposed plan.  The increases in payments that Debtor proposes
in his plan correspond to the dates when these loans will be paid in full.

MEMORANDUM OF DECISION - 4

granted, and the parties have submitted their closing briefs.  Docket Nos.

42-44.

### *Facts*

Debtor is employed full-time as an investigator by the Office of

Personnel Management for the federal government, and is an officer in the

Idaho National Guard.  As a member of the military, Debtor has been

deployed several times, both within the United States, and abroad.  In

2004, Debtor was deployed to Iraq, where he was stationed for one year.

Debtor is unmarried.[5]

Upon his return from Iraq, Debtor resumed his work as an

investigator for the federal government.  He was transferred from his

previous assignment in Northern Idaho, and although his territory now

covers most of Southern Idaho, his principal duties are conducted at the

Mountain Home Air Force Base and at Idaho National Laboratory in Idaho

Falls.

---

[5] In Debtor's view, his repeated military deployments ultimately resulted
in a divorce from his spouse.  Debtor separated from his spouse in February,
2003, and the divorce became final in June, 2004.

MEMORANDUM OF DECISION - 5

Having recently returned from a foreign military deployment,

Debtor testified that he was anxious to put down roots, and he attempted

to find suitable living arrangements near Mountain Home.  He testified

that, at that time, he had good credit and was pre-approved for a $300,000

home construction loan.  He investigated several home sites with sufficient

acreage[6] near Mountain Home but, he explained, felt that land prices in the

area were inflated.  Debtor also testified that the climate around Mountain

Home was too hot for his tastes.  Instead, Debtor located a forty-acre

parcel near Fairfield that was selling for $86,000, a price he felt was

reasonable.  A contractor estimated that it would cost $203,000 to build a

three-bedroom house on the property.  Debtor decided to purchase the

land, construct the house, and obtained a loan from Wells Fargo to

accomplish that end.

While the house was being constructed, Debtor borrowed additional

funds so that he could construct a small shed and horse stables, and install

---

[6] According to Debtor's sworn schedules, he owns four Alaskan huskies
and four paint horses.  Presumably, Debtor was looking for a home site with
enough land to accommodate a house as well as his animals.

MEMORANDUM OF DECISION - 6

a fence on the property.  The house was completed in December, 2006.

Debtor testified that because he carefully monitored the construction, the

total cost of the house was actually several thousand dollars below budget.

However, by that time, he had incurred approximately $55,000 in

unsecured debt.  When Debtor sought to convert his construction loan into

a conventional loan, he learned that the bank had added significant costs

and fees to the balance due, which increased the financing cost by

approximately $25,000.  This higher cost significantly impacted Debtor's

debt-to-income ratio, which in turn meant his new loan would carry a

higher interest rate and monthly payments.[7]

Debtor testified that he knew that he needed to get out from

underneath the construction loan, with its high interest rate, as quickly as

possible.  He attempted to find alternative financing, but each of the

lenders he contacted declined to extend him a loan on better terms.

Feeling that he had no other choice, Debtor ultimately returned to Wells

---

[7]  While the Court does not doubt that he was surprised by what occurred,
Debtor was unable to adequately explain the nature of these additional bank
costs and fees.

MEMORANDUM OF DECISION - 7

Fargo and took out the mortgage loan with a higher principal balance and a higher interest rate than he had intended when he first decided to build the house.[8]  Debtor testified that he knew he was facing financial trouble at that point, but was hopeful that he could refinance in the near future and weather his predicament.  In spite of his hopes, because of the high cost of his mortgage, Debtor was unable to stay current on all of his other debt obligations, and began missing regularly scheduled payments on some of these debts.

In June, 2007, after only six months in the new house, Debtor attempted to secure a second mortgage, which he could use to pay off some of his unsecured debt which carried higher interest rates.  He learned that because it had been more than six months since his house had been appraised, he would need to get a fresh appraisal to support any new loan. Although Debtor owed approximately $310,000 on the property, the new

---

[8]  When Debtor first began constructing the house, he had expected his monthly payments to be approximately $1,750.  The monthly principal and interest payment on the new loan is approximately $2,130.

MEMORANDUM OF DECISION - 8

appraisal came back at only $303,500,[9] and Debtor was unable to qualify for a new loan.

Debtor has access to a government vehicle to use for work-related travel. Normally, when not using it in his work, Debtor is required to park the vehicle at the Mountain Home Air Force Base. Debtor explained that he travels to Mountain Home for work at least three times per week, a distance from his Fairfield home of approximately eighty miles. Ex. 102. Debtor also travels to Twin Falls one time each month for National Guard training. Twin Falls is approximately seventy-three miles from his residence. *Id.*

For the past few years, Debtor has attempted to breed and sell his horses. According to his testimony, Debtor has two geldings, one older mare, and a young filly. Only the younger filly will be used in the breeding business. Since beginning this enterprise, it appears that Debtor has only sold one foal.

---

[9] In December, 2006, when the house was completed, it was appraised at approximately $350,000.

MEMORANDUM OF DECISION - 9

In connection with his role as an investigator, Debtor has top-secret security clearance.  In September, 2007, Debtor's security clearance came up for regular review.  Debtor's financial difficulties complicated this process, which lasted several months, but he ultimately obtained a favorable rating in May, 2008, after he filed his bankruptcy petition. Debtor testified that a final condition of that adjudication was that he show proof that he had actually filed for bankruptcy, and that his financial situation would continue to be reviewed on an annual basis.

At the time his petition was filed, Debtor was one month delinquent on his mortgage, and had incurred approximately $70,000 in unsecured debt.  Debtor proposed a sixty month plan, through which he intended to cure the mortgage arrearage, pay administrative expenses and Trustee's fees, and contribute the remaining balance to his unsecured creditors. Debtor sought to discharge those unsecured debts that remained unpaid at the conclusion of the plan pursuant to § 1328(a).

MEMORANDUM OF DECISION - 10

*Discussion*

I.

Trustee argues that Debtor's plan was not filed in good faith as required by § 1325(a)(3). To resolve this objection, as indicated to the parties at the confirmation hearing, the Court's primary concern is not whether Debtor filed his chapter 13 petition in bad faith, but rather whether his second amended plan is consistent with the overall policies of chapter 13 and was, therefore, proposed in good faith. *Compare* 11 U.S.C. § 1325(a)(7) (providing that "the court shall confirm a plan if . . . the action of the debtor in filing the petition was in good faith;") *with* 11 U.S.C. § 1325(a)(3) (providing that "the court shall confirm a plan if . . . the plan has been proposed in good faith and not by any means forbidden by law.").[10]

---

[10] While Trustee has not challenged Debtor on the point, there is ample evidence in the record to conclude that Debtor's chapter 13 filing was undertaken in good faith. The combination of Debtor's military deployment, marital problems, job transfer and relocation, and the various financial problems Debtor encountered with the construction of his house in Fairfield, compel a finding that Debtor was properly motivated in filing for bankruptcy relief.

MEMORANDUM OF DECISION - 11

Under the applicable case law, the model for determining whether a debtor's plan was proposed in good faith was clear - bankruptcy courts were to make that determination on a case-by-case basis, after considering the totality of the circumstances. *See Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1222-23 (9th Cir. 1999); *In re Tucker*, 989 F.2d 328, 330 (9th Cir. 1993); *In re Goeb*, 675 F.2d 1386, 1390 n. 9 (9th Cir. 1982); *In re Yochum*, 96.2 I.B.C.R. 77, 78 (Bankr. D. Idaho 1996). Whether a debtor's plan was proposed in good faith was a question of fact. *Smyrnos v. Padilla (In re Padilla)*, 213 B.R. 349, 352 (9th Cir. B.A.P. 1997). The burden of establishing good faith rested on the debtor. *Id.*

In *Leavitt,* the Ninth Circuit held that in determining whether a chapter 13 petition or plan was proposed in good faith, a bankruptcy court should consider: (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Code, or otherwise filed his petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat state court litigation; and (4) whether egregious behavior is present. 171 F.3d at 1224. Again,

MEMORANDUM OF DECISION - 12

though, the issue in this case focuses not on Debtor's motivation in

commencing his chapter 13 case, but rather, whether his plan was filed in

good faith.  In that regard, the Bankruptcy Appellate Panel has identified a

non-exhaustive list of factors which bankruptcy courts should consider.

Those factors include:

> 1)  The amount of the proposed payments and the amounts of the debtor's surplus;

> 2)  The debtor's employment history, ability to earn, and likelihood of future increases in income;

> 3)  The probable or expected duration of the plan;

> 4)  The accuracy of the plan's statements of the debts, expenses and percentages of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

> 5)  The extent of preferential treatment between classes of creditors;

> 6)  The extent to which secured claims are modified;

> 7)  The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

MEMORANDUM OF DECISION - 13

8)  The existence of "special circumstances" such
as inordinate medical expenses;

9)  The frequency with which the debtor has
sought relief under the [Bankruptcy Code];

10)  The motivation and sincerity of the debtor in
seeking Chapter 13 relief; and

11)  The burden which the plan's administration
would place upon the trustee.

*In re Padilla*, 213 B.R. at 352-53.  This Court has previously employed this

analytical paradigm as a guide in determining whether a chapter 13 plan

has been proposed in good faith.  *See In re Johnson*, 262 B.R. 831, 839 (Bankr.

D. Idaho 2001) (finding that, on balance, debtor's chapter 13 plan was

proposed in good faith).

But Debtor reminds the Court that time passes, and since the above

decisions were made, Congress has amended the Code.  *See* Bankruptcy

Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.

L. 109-8, 119 Stat. 23 (Apr. 20, 2005).  In light of the changes brought about

by BAPCPA, and the cases interpreting the amendments, such as the Ninth

Circuit's recent decision in *Maney v. Kagenveama (In re Kagenveama)*, 541

MEMORANDUM OF DECISION - 14

F.3d 868 (9th Cir. 2008), Debtor challenges the continuing vitality of the

former "good faith" analytical model and insists it must be reexamined.

Essentially, Debtor argues that by adopting a "means test" in BAPCPA,

Congress has chosen a formulaic approach to determine whether chapter

13 plans should be confirmed, a methodology that promotes certainty and

objectivity and is intended to displace the subjective, discretion-based

"totality of the circumstances" test.  Debtor argues that, unlike the "old

days" when the bankruptcy court was called upon to make judgments

about a debtor's lifestyle choices in deciding whether to confirm a plan,

under BAPCPA's means test, a debtor's expenses "are what they are," and

whether they could be lower if certain adjustments were made to the

debtor's circumstances is simply not a relevant inquiry.  Docket No. 42.

Trustee, though not specifically addressing *Kagenveama*, advocates

retention of the case-by-case approach to determine whether a plan has

been proposed in good faith.  She explains that BAPCPA did not displace

the requirement that a debtor's expenses must be "reasonably necessary."

*See* 11 U.S.C. § 1325(b)(3).  In short, because in constructing his going-

MEMORANDUM OF DECISION - 15

forward budget Debtor attempts to deduct several expenses[11] from his monthly income which Trustee believes are not reasonably necessary, Debtor is not committing his entire disposable income to plan payments, and in her view, has not proposed his plan in good faith.

After carefully reviewing the Ninth Circuit's decision in *Kagenveama*, the Court is not persuaded that the changes wrought by BAPCPA require the Court to abandon the totality of the circumstances approach when determining whether a debtor's plan is proposed in good faith for purposes of § 1325(a)(3). Accordingly, the Court follows that approach in determining whether Debtor's plan should be confirmed in this case.

## II.

### A.

At bottom, *Kagenveama* is a decision about statutory interpretation, not good faith. In it, the Ninth Circuit addressed the meaning of two

---

[11] Trustee is primarily concerned with the expenses associated with Debtor's housing, his transportation, and his horse-breeding business.

MEMORANDUM OF DECISION - 16

phrases found in § 1325(b) as amended by BAPCPA: "projected disposable income" and "applicable commitment period" in connection with the bankruptcy court's determination whether a debtor's plan had provided that "all . . . projected disposable income to be received in the applicable commitment period . . . will be applied to payments to unsecured creditors under the plan." *Kagenveama*, 541 F.3d at 871.[12]  Reduced to its essence, in its majority's opinion, the court reiterated that "disposable income" is a defined term in the Bankruptcy Code, but that "projected disposable income" is not.  *Id.* at 872.  Though not expressly defined, the court concluded that to determine a debtor's "projected disposable income," bankruptcy courts should start with a debtor's "disposable income" as defined by § 1325(b)(2), and project that amount over the "applicable commitment period."  *Id.*  In reaching this conclusion, the Circuit declined to adopt the argument presented by the chapter 13 trustee that the "disposable income" calculation was intended merely as a "presumptive"

---

[12]  In this case, neither party disputes that Debtor is an above median income debtor or that the applicable commitment period is sixty months.

MEMORANDUM OF DECISION - 17

starting point, to which additional evidence could be submitted to adjust

this figure and arrive at a debtor's true "projected disposable income." *Id.*

at 874. The Ninth Circuit noted:

> no text in the Bankruptcy Code creates a
> presumptively correct definition of "disposable
> income" subject to modification based on
> anticipated changes in income or expenses. In
> fact, the textual changes enacted by BAPCPA
> compel the opposite conclusion. The revised
> "disposable income" test uses a formula to
> determine what expenses are reasonably
> necessary. *See* 11 U.S.C. § 1325(b)(2)-(3). This
> approach represents a deliberate departure from
> the old "disposable income" calculation, which
> was bound up with the facts and circumstances of
> the debtor's financial affairs.

*Id.* (additional citations omitted).

Whatever the impact the above quoted language may have in

determining whether a debtor has committed all of his or her "projected

disposable income" to plan payments, the court's instructions say nothing

about the pre-BAPCPA requirement under § 1325(a)(3) that, to be

confirmed, a chapter 13 plan must also be proposed in good faith. In other

words, while *Kagenveama* guides bankruptcy courts in interpreting certain

MEMORANDUM OF DECISION - 18

new terms in the Code, it does not require them to retreat from the pointed,

case-by-case analysis used to determine whether a plan has been proposed

in good faith as formulated in its earlier decisions.

### B.

The apparent overlap between § 1325(a)(3) and § 1325(b) has long

been a subject of dispute among bankruptcy courts.  When § 1325(b) was

first added to the Code, several courts concluded that its adoption

narrowed the focus for determining good faith under § 1325(a)(3) because

many of the factors previously considered under the totality of the

circumstances test were subsumed in the "ability-to-pay" test embodied in

§ 1325(b).  *See Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir. 1992) ("Most of

these factors were 'subsumed' by 11 U.S.C. § 1325(b) . . . which narrowed

the focus of the bankruptcy court . . . ."); *In re Smith*, 848 F.2d 813, 820 (7th

Cir. 1988) (noting the adoption of § 1325 eliminated some of the old factors

related to amount of plan payments).  However, in spite of the new

§ 1325(b), other courts continued to regard a debtor's ability to pay

creditors as one of the many important factors to be considered in the

MEMORANDUM OF DECISION - 19

totality of the circumstances test.  *See, e.g., In re Gier*, 986 F.2d 1326, 1328-29

(10th Cir. 1993) (considering proposed plan payments in comparison to

monthly surplus as part of the good faith analysis); *In re Loper*, 367 B.R. 660,

669-70 (Bankr. D. Colo. 2007) (noting that the Tenth Circuit never limited

the good faith test to preclude an analysis of the debtor's expenses and

resulting plan contribution).

　　　　The recent amendment of § 1325(b) occasioned by BAPCPA, has, as

one bankruptcy court put it, "rekindled this debate."  *In re McGillis*, 370

B.R. 720, 740 (Bankr. W.D. Mich. 2007).  In light of the amendment, some

courts have held that technical compliance with § 1325(b) creates a safe

harbor, and precludes a finding of bad faith.  *See In re Alexander*, 344 B.R.

742, 752 (Bankr. E.D.N.C. 2006) (finding that calculation of a debtor's

disposable income must be determined under § 1325(b) and is not an

element of good faith); *In re Farrar-Johnson*, 353 B.R. 224, (Bankr. N.D. Ill.

2006) (good faith is a factor in confirmation, but the calculations on Form

B22C create a safe harbor).  At the other end of the spectrum, other courts

hold that § 1325(a)(3) ultimately requires a debtor to contribute all he or

MEMORANDUM OF DECISION - 20

she can afford to pay creditors under a plan, regardless of what § 1325(b) might otherwise dictate.  *See In re Anstett*, 383 B.R. 380, 385-86 (Bankr. D.S.C. 2008)*; In re Upton*, 363 B.R. 528, 536 (Bankr. S.D. Ohio 2007).

An intermediate approach has been adopted by several other courts. Under this approach, "the sufficiency of the assets devoted to the plan is not a basis for a finding of lack of good faith under § 1325(a)(3), unless there is a showing of some sort of manipulation, subterfuge or unfair exploitation of the Code by the debtor." *In re Williams*, 394 B.R. 550, 572 (Bankr. D. Colo. 2008); *see also In re Briscoe*, 374 B.R. 1, 22 (Bankr. D.D.C. 2007) (recognizing exceptions for debtors "engaging in subterfuge so blatant as to indicate that they have 'unfairly manipulated the Bankruptcy Code, or otherwise proposed [their] Chapter 13 plan in an inequitable manner.'" (quoting *In re Goeb*, 675 F.2d at 1390)).  This approach recognizes that even where a debtor has satisfied the mechanical requirements of § 1325(b), a more subjective analysis of the debtor's good faith and the totality of the circumstances is mandated by § 1325(a)(3).  *In re Williams*, 394 B.R. at 572.

MEMORANDUM OF DECISION - 21

In this Court's view, this intermediate approach makes the most sense, and reflects the distinct functions accomplished by § 1325(b) and § 1325(a)(3), in particular, and the policies of the Code in general. The "projected disposable income" requirement of § 1325(b) establishes a formula for calculating plan payments by deducting generic expense items from time-tested income. In contrast, the good faith requirement of § 1325(a)(3) gauges the overall fairness of a debtor's treatment of creditors under a plan, and prevents debtors seeking chapter 13 relief from treating their creditors inequitably. In other words, satisfying the "projected disposable income" rubric under § 1325(b) is not a reason to allow a debtor to unfairly prejudice creditors. The Court is persuaded by the wisdom in this approach, and will therefore continue to consider the totality of the circumstances when determining whether a debtor's plan is proposed in good faith.

III.

The overriding theme of Trustee's argument is that while Debtor is

MEMORANDUM OF DECISION - 22

seeking relief from the burden of his debts, he insists on maintaining a

lifestyle that includes excessive expenditures for housing, transportation,

and unprofitable business pursuits.  She therefore challenges Debtor's

good faith in proposing his plan for confirmation.

### A.

Compared to his income, Debtor's second amended plan proposes

relatively small monthly payments to Trustee.[13]  Debtor's most recent

amended Official Form 22C shows he has no income in excess of the

proposed plan payments.  However, Trustee challenges the propriety of

several expenses listed in the Form, which if reduced or eliminated, would

allow Debtor to make substantially larger payments and pay all unsecured

creditors in full during the term of his plan.

### 1.

At the heart of Trustee's concerns is Debtor's attempt to retain his

---

[13]  The plan proposes 42 monthly payments of $120, 11 monthly payments
of $200, and 7 monthly payments of $240, as well as two annual payments of
$1,500, for a total of $11,920 over the term of the plan.  Debtor's annual salary as
an investigator for the federal government is approximately $70,000 and his
annual salary as an officer in the National Guard is approximately $12,000.

MEMORANDUM OF DECISION - 23

current house and acreage with its attendant monthly expenses in excess of

$2,300.[14]  According to Debtor's schedules, Debtor is upside down as to this

property.  He reported that the value of the house and land was $305,000,

and that he owed approximately $310,000 to the mortgage lender.  Ex. 201.

To service his monthly mortgage obligation and cover property taxes and

insurance, Debtor pays more than four times the IRS allowable housing

expense for a single person household in Camas County.[15]

In commenting upon the IRS standards which have been imported

into the Code, one court explained:

> Section 1325(b)(3) should not be interpreted as
> categorically substituting the Section 707(b)(2)
> expense restrictions for the "reasonably
> necessary" expense requirement already imposed
> by Section 1325(b)(2).  Rather, it should be
> interpreted as offering a further guideline for
> ensuring that the expenses claimed by an above-
> median-income debtor are reasonably necessary.

---

[14]  Debtor's monthly housing expense is broken down as follows: principal
and interest on mortgage - $2,130; property taxes - $137.88; property insurance -
$70.83.

[15]  The IRS allowable housing expense for a single person household in
Camas County is $565.  *See* www.usdoj.gov/ust/.

MEMORANDUM OF DECISION - 24

*In re McGillis*, 370 B.R. at 729 (*citing In re McPherson*, 350 B.R. 38, 45 (Bankr.

W.D. Va. 2006).  This Court has previously found that a debtor's actual

expenses must still be tested for reasonableness under the circumstances.

*See, e.g., In re Meek*, 370 B.R. 294, 308 (Bankr. D. Idaho 2007) (explaining that

in determining whether claimed expenses are proper, the proposals of both

above- and below-median income debtors must be tested for

reasonableness and necessity).[16]

 Debtor's decision to maintain his Fairfield home is also problematic

because its location necessitates his high transportation expense.  Debtor's

house is eighty miles from his primary place of employment in Mountain

Home, and seventy-three miles from Twin Falls where he completes his

---

[16] In her closing argument, Debtor's attorney cited *Meek* for the
proposition that this Court has confirmed the appropriateness of deducting
actual mortgage expenses irrespective of their reasonableness.  Debtor's assertion
in this regard is incorrect.  Although it is true that the Court in *Meek* allowed the
debtors to deduct their entire actual mortgage expense when determining their
disposable income, it did not hold that such would be proper in all cases.  Quite
to the contrary, the Court carefully explained that when determining whether
claimed expenses are proper, the proposals of both above and below median
income debtors are "tested for reasonableness and necessity."  *In re Meek*, 370
B.R. at 308.

MEMORANDUM OF DECISION - 25

monthly National Guard training.  Debtor testified that he travels to

Mountain Home on average three times per week, and to Twin Falls at

least once per month, meaning that to commute to and from work each

month, Debtor must travel approximately 2,250 miles.  Debtor testified he

drives a 1995 Dodge Ram pickup which gets approximately twelve miles

per gallon.  Debtor is not reimbursed for travel-related expenses in getting

to and from work.[17]

Some bankruptcy courts have refused, absent special circumstances,

to allow debtors to claim transportation expenses in excess of the local IRS

standards.  *See, e.g., In re Tranmer*, 355 B.R. 234, 251 (Bankr. D. Mont. 2006);

*In re Renicker*, 342 B.R. 304, 309 (Bankr. W.D. Mo. 2006).  In *Tranmer*, the

debtors sought to take an additional $180 per month expense based on the

---

[17]  Debtor testified that when he decided to build a house in Fairfield, he
was under the impression that his primary employer would grant him
"domiciliary parking," which would allow him to park his government-issued
vehicle at his residence.  Ultimately, his request for domiciliary parking was
denied.  Had the request been granted, Debtor's transportation expenses would
be significantly less.  It is understandable that Debtor made the decision to locate
in Fairfield based upon this assumption.  The reasonableness of his decision to
remain in Fairfield, though, must be tested by his new financial circumstances
and the current facts.

MEMORANDUM OF DECISION - 26

distance they needed to travel for work and for other personal reasons.

The bankruptcy court explained, that absent special circumstances, debtors

would be limited to the local IRS standards. *Tranmer*, 355 B.R. at 251. The

court noted that special circumstances means "circumstances beyond a

debtor's reasonable control . . . [but it] does not include debtor's [sic] desire

to remain living wherever they choose, even when their place of

employment changes or requires a long commute." *Id.*

In this case, Debtor has carefully documented that he incurs actual

monthly transportation expenses in excess of $800, over seventy-five

percent of which are attributable to fuel costs. Exs. 102, 104. However,

Debtor has not identified any special circumstances that would persuade

the Court to allow the additional $400 expense which Debtor requests in

his budget for transportation.[18]

Is it inequitable for Debtor to ask his creditors to subsidize his

---

[18]  Debtor claims the full amount of the local IRS standard for transportation on Line 27A of Official Form 22C, which is $211, plus an additional $200 for maintenance because his vehicles are more than seven years old. Ex. 1. Debtor also claims an additional $400 on Line 57 which represents that portion of Debtor's actual fuel cost which is above the local IRS standard.

MEMORANDUM OF DECISION - 27

decision to work in Mountain Home, but to live on an acreage in Fairfield in which he has no equity?  Again, the record shows that Debtor understood that the bulk of his work responsibilities would be at the Mountain Home Air Force Base *before* choosing to purchase the land and build his house in Fairfield.  It is not as if he was settled in a home, and only then informed that he would be reassigned to a new location farther away.  All things considered, the Court concludes that Debtor's attempt to use chapter 13 to maintain his comparatively expensive residence in Fairfield, in which he has not equity, and which requires him to commute great distances to and from his employment, an inappropriate manipulation of the Code.

Debtor has not attempted to prove that adequate, cheaper housing is not available to him in areas nearer to his principal place of employment. Absent such proof, the Court presumes the cost to Debtor would likely be less than that required to maintain his current arrangements.  Moreover, the Court finds that living closer to Mountain Home could substantially reduce Debtor's transportation expenses.  Indeed, the Court suspects

MEMORANDUM OF DECISION - 28

Debtor could generate significant additional monthly income for plan

payments to his creditors if he would forego retention and ownership of

the Fairfield acreage and seek housing closer to his job.  Under these

circumstances, Debtor's preference for a cooler climate and country home

site must give way to his desire, and need, to reorganize his financial

affairs.  Such is the cost Congress expects debtors to bear in exchange for

the many benefits of chapter 13 relief.

2.

Trustee also argues that the expenses associated with Debtor's horse

breeding business are not reasonably necessary and Debtor should not be

allowed to subsidize an unprofitable venture by reducing his plan

payments.[19]  Trustee and Debtor dispute whether this business operates at

a profit.  In support of his argument, Debtor offered a profit and loss

statement spanning the period of August, 2007 to July, 2008.  Ex. 106.  That

---

[19]  To be fair, according to the most recent version of Debtor's Official
Form 22C on file, these expenses are listed on Line 60 and are not currently being
deducted when calculating Debtor's monthly "disposable income."  *See* Docket
No. 38; Ex. 1.

MEMORANDUM OF DECISION - 29

exhibit shows that the only income generated during that period was from
the sale of a foal in August, 2007 for $1,000.  During that same time, the
expenses for feed, veterinary and farrier services amounted to $1,057,
resulting in a net loss of $57.

Debtor explained, however, that these figures are somewhat
misleading.  The expenses listed in the exhibit are for two horses, but going
forward, Debtor will only have one horse to breed.  Thus, the expenses
should be cut in half, and if Debtor is able to sell one foal every two years,
the business should break even.

Although Debtor's argument sounds logical enough, it suffers from
at least one serious flaw, in that the documented expenses do not include
stud fees.  Debtor's filly is not currently in foal.  Debtor's male horses are
gelded, so in order to breed his filly, he would presumably need to hire a
stud and pay a fee.  The record includes no evidence or testimony as to
how much this fee would be, but that information is not crucial in this case.
Assuming, *arguendo*, that Debtor is able to sell a foal every other year and
his expenses remain approximately equal, Debtor's business would not

MEMORANDUM OF DECISION - 30

break even as he suggests, but would still operate at a slight loss.  When a

stud fee is added to the expense column of the balance sheet every other

year, the business is driven further into the red.

Absent proof that Debtor's horse breeding enterprise is a feasible,

profitable venture, it is unfair to his creditors that he expect to continue it

while in chapter 13.  While working with these animals may provide

recreation and personal satisfaction to Debtor, realistically viewed, the

endeavor amounts to a potential drain on his pocketbook.  Debtor's choice

to continue pursuing this operation comes at the expense of his creditors,

whose legitimate debts continue to go unpaid.  Given these circumstances,

a good faith approach to reorganization of his financial affairs would not

endorse the use of funds otherwise available for plan payments to

subsidize such an  enterprise.

B.

As previously indicated, Debtor's plan, schedules, and other

submissions have been amended and revised several times.  Each revision

has come only as a targeted response to Trustee's objections to

MEMORANDUM OF DECISION - 31

confirmation, though Debtor urges that the mistakes in earlier submissions were not intended to mislead the Court.  At the hearing, Debtor testified that he spent several hours pouring over the documents with his attorney in an attempt to make them as accurate as possible.  Notwithstanding this effort, it appears that the most recent version of Official Form 22C contains a lower figure for Debtor's income than was reported in earlier versions of the form.  At the confirmation hearing, Debtor could not explain the discrepancy.[20]

Debtor proposes to pay a total of $11,920 into his plan.  With this amount, Debtor proposes to cure his mortgage arrearage and pay both his attorney's fees and the Trustee's fee.  The balance is to be disbursed to unsecured creditors.  Debtor's schedules document approximately $70,000 in unsecured debt.  Ex. 201.  After payment of administrative expenses and the mortgage arrearage, there will be precious little remaining for Trustee

---

[20]  Debtor's counsel did not address this point in her closing arguments, and it remains unclear to the Court why it should be so difficult for Debtor to provide accurate information about his income in this regard, and why this figure has changed in the various forms.

MEMORANDUM OF DECISION - 32

to distribute to unsecured creditors.

C.

In the context of a good faith inquiry, "special circumstances" are those which are beyond a debtor's reasonable control, such as a serious medical condition or a call to active duty in the military. *Tranmer*, 355 B.R. at 251. No special circumstances have been shown to exist in this case at this time.

Debtor is relatively young, healthy, and does not have any inordinate medical expenses. Debtor is not currently on active duty in the military, but, according to his testimony, he is scheduled to be deployed again in 2010. If he is deployed again, Debtor will no longer receive his salary as a federal investigator. However, Debtor does not anticipate the loss of this salary to create any hardship because, due to his length of service and rank, his military pay is slightly higher than his salary as an investigator. And while deployed, Debtor acknowledges he will have fewer living expenses. Debtor's military status and prospects for deployment do not presently constitute special circumstances justifying

MEMORANDUM OF DECISION - 33

lower plan payments under these facts.

D.

Having considered all appropriate factors, in the exercise of its

discretion, the Court concludes that Debtor has not shown that his second

amended plan is proposed in good faith.  Instead, the Court is left with the

firm conviction that Debtor, although sincere in his need to reorganize his

finances, is unwilling to engage in the kind of meaningful belt-tightening

that could reasonably be expected from those earning as much as he does.

Simply put, Debtor's plan does not provide equitable treatment to creditors

as required by § 1325(a)(3).  *See In re Yochum*, 96.2 I.B.C.R. at 78 (*citing In re*

*Goeb*, 675 F.2d at 1390).

*Conclusion*

Debtor's failure to adequately trim his monthly expenses

demonstrates a lack of good faith and sincerity in attempting to deal with

his creditors.  Instead, Debtor's plan treats creditors inequitably.

Confirmation of Debtor's second amended plan will be denied by

separate order.  While Debtor will be given yet another opportunity to

MEMORANDUM OF DECISION - 34

amend his plan, any such amended plan should accommodate the

problems highlighted by the Court in this decision.  If Debtor is unwilling

or unable to propose a confirmable plan, Debtor should expect his case will

be dismissed.

Dated: November 7, 2008

Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 35